LOCAL UNION NO. 48 OF SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, Appellant,

v.

The HARDY CORPORATION, Appellee.

No. 20759.

United States Court of Appeals
Fifth Circuit.

June 12, 1964.

Rehearing Denied July 23, 1964.

Jerome A. Cooper, Birmingham, Ala., Donald W. Fisher, Toledo, Ohio, Mulholland, Hickey & Lyman, Toledo, Ohio, Cooper, Mitch & Crawford, Birmingham, Ala., of counsel, for appellant.

Louis Sherman, Washington, D. C., amicus curiae.

M. L. Taliaferro, C. V. Stelzenmuller, Birmingham, Ala., Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, Ala., of counsel, for appellee.

Before BELL, Circuit Judge, and INGRAHAM,* District Judge.

GRIFFIN B. BELL, Circuit Judge.

The sole question presented by this appeal is whether a hot cargo clause contained in a contract between a contractor and a labor union in the construction industry may be judicially enforced. The relevant facts are undisputed. The case comes here from an order of the District Court holding the clause in question valid but denying enforcement, and dismissing the complaint in which enforcement was sought except insofar as the order constituted a declaration of rights under the contract. The counterclaim of Hardy seeking damages by reason of the union having filed suit to enforce the hot cargo clause was likewise dismissed. The opinion of the District Court is reported sub nom. Local Union No. 48 of Sheet Metal Workers International Association v. The Hardy Corporation, N.D.Ala., 1963, 218.F.Supp. 556.

Appellant is a labor organization representing sheet metal workers in a portion of Alabama. Hardy is an employer of sheet metal workers in the construction industry. The contract out of which the issue arises was entered into on June 1, 1961 and the provision in dispute, Article II, § 1, is as follows:

"No employer shall subcontract or assign any of the work described herein which is to be performed at a job site to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project."

Notwithstanding, Hardy subcontracted work involving the installation of metal pan acoustical ceiling to Backus Engineering Company without requiring Backus to comply with the conditions of employment set out in the contract. Backus, in fact, did not comply. Appellant union processed the breach as a grievance under the contract to the Local Joint Adjustment Board where it contends a final and binding award of a violation of Article II, § 1 was made. Hardy disputes this contention.

This action was then filed, seeking damages for breach of the contract, a declaration of the rights accruing to appellant and its employees under the contract, and enforcement of the award claimed to have been rendered by the Local Joint Adjustment Board. Jurisdiction was based on § 301(a) of the National Labor Relations Act as amended. 29 U.S.C.A. § 185(a). Jurisdiction of the counterclaim was based on § 303(b) of the Act, 29 U.S.C.A. § 187(b).

The question, presented in the District Court and here, depends for answer on whether judicial enforcement of the so-called hot cargo or restrictive subcontracting clause in a construction industry agreement is forbidden by the provision of § 8(b) (4) (ii) (B) of the Labor Act, as amended. 29 U.S.C.A. § 158(b) (4) (ii) (B). And that answer,

---

* Judge CAMERON, the third judge constituting the Court originally hearing this case, died after argument but before decision. Consequently, this decision and opinion is rendered by a quorum pursuant to Title 28 U.S.C.A. §§ 46(c) and (d).

in turn, depends on whether judicial enforcement amounts to coercion as that term is used in this statute, in pertinent part as follows:

"(b) It shall be . an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(4) \* \* \* (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

"(B) forcing or requiring any person to cease \* \* \* doing business with any other person, \* \* \* ."

This narrowness of the issue stems from the exception of agreements of the type here in question from the hot cargo proscription added to the Act under the 1959 amendment when the agreement relates to the subcontracting of work to be done at a construction site. Section 8(e) of the Labor Act, as amended, 29 USCA, § 158(e), provides that merely entering into such an agreement is an unfair labor practice except when the agreement relates to work to be done at construction industry job sites. This section, enacted simultaneously with the applicable language, supra, of § 8(b) (4) (ii) (B) reads:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing

such an agreement shall be to such extent unenforcible and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting or work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: \* \* \* ." [1]

It is clear then that the Act, through the medium of the amendments set out in §§ 8(b) (4) (ii) (B) and 8(e) contains a double-barrelled proscription against such agreements. It is an unfair labor practice to enter into such an agreement under § 8(e), and the agreement is unenforcible and void. It is also an unfair labor practice to seek to enforce the agreement by threats, coercion or restraint under § 8(b) (4) (ii) (B). See the discussion in Construction, Production and Maintenance Laborers Union, Local 383 v. National Labor Relations Board, 9 Cir., 1963, 323 F.2d 422. It follows that the agreement here is exempted from the operation of § 8(e), and is thus valid and otherwise subsisting insofar as the Labor Act is concerned. It may not, however, be enforced by threats, coercion or restraint.

The reasoning applied by the District Court in denying judicial enforcement of the agreement was that such a course of action would amount to coercion within the contemplation of § 8(b) (4) (ii) (B), albeit through court processes and not a form of economic pressure or self help. Thus is the question presented.

While the authorities to sustain this or a contrary view are admittedly sparse, we are constrained to a view opposite that of the District Court. This will avoid the anomalous situation of an agreement, left valid under one section of the Act but unenforcible by threat,

1. Section 8(e) also contains two exceptions applicable to the apparel and clothing industry. These exempt the clothing and apparel industry not only from § 8 (e), as is the case with the construction industry, but also from § 8(b) (4) (B) of the Act. See Employing Lithographers of Greater Miami v. N. L. R. B., 5 Cir., 1962, 301 F.2d 20.

coercion or restraint under another section, being rendered of little or no value by an interpretation of coercion to embrace the use of the courts. These sections were enacted concurrently and we think clear language would be necessary to convey a congressional intent that a party to an otherwise valid labor agreement may not turn to the courts for relief upon its breach.

The case of Local No. 1976 United Brotherhood of Carpenters and Joiners of America v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, generally referred to as the Sand Door case is necessary background to these amendments to the Act. There the Supreme Court, while upholding the validity of a hot-cargo agreement held nevertheless that it was not a defense to an unfair labor practice charge brought under § 8(b) (4) (A).[2]

The purpose of the amendments, as applicable here, was two-fold: first, to make the mere entering into of such an agreement an unfair labor practice, and second, to make it an unfair practice to threaten, coerce, or restrain any person with the objective of requiring that person to cease doing business with another. The latter had the effect of closing a loophole existing after the Sand Door decision with respect to secondary boycotts. The state of the law at that time was that such agreements were valid. A union might not induce employees of a secondary employer to strike in order to enforce a hot cargo clause, but it was permissive to threaten the secondary employer with a strike or other economic retaliation in order to force him to cease doing business with a primary employer with whom the union had a dispute. The purpose of the (ii) language was to make the use of such coercion against an employer an unfair labor practice.[3] Section 8(e) went further and made it an unfair labor practice to enter into a so-called hot cargo clause or agreement but as we have noted an agreement of the type here involved was excepted. See statement regarding this and other loopholes dealt with by Congress in the amendments in N. L. R. B. v. Fruit and Vegetable Packers and Warehousemen, Local 760, 1964, 84 S.Ct. 1063, 12 L.Ed.2d 129.

It will be seen then that only if the intention of the (ii) language was to prohibit judicial enforcement of a contract otherwise recognized as valid and enforcible under § 8(e) can the employer here prevail. And the chink in the loophole with which we are concerned is the word "coerce".

The District Court took the dictionary definition as its meaning in the Act and determined that it embraced judicial ac-

2. In pertinent part prior to the 1959 amendments:

"It shall be an unfair labor practice for a labor organization or its agents * * * (4) to engage in, or to induce or encourage the employees or any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring * * * any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any person * * *."

3. Congressman Griffin, one of the authors of the amendments, had this to say with regard to the existing law:

"The courts also have held that, while a union may not induce employees of a secondary employer to strike for one of the forbidden objects, they may threaten the secondary employer, himself, with a strike or other economic retaliation in order to force him to cease doing business with a primary employer with whom the union has a dispute. This bill makes such coercion unlawful by the insertion of a clause 4(ii) forbidding threats or coercion against 'any person engaged in commerce or an industry affecting commerce.'" II Leg.Hist. Labor-Management Reporting and Disclosure Act of 1959 (Gov't. Printing Office) 1523.

See also comments of Senator Goldwater, Id., at p. 1079.

tion.[4] Barrows v. Jackson, 1953, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 and Shelley v. Kraemer, 1948, 342 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 116, 3 A.L.R.2d 441, were also cited to demonstrate that legal action or court action amounts to coercion; there state action. Of course, it cannot be successfully urged that a court order or decree is not coercive, or that the mere filing of a suit and its prosecution is not likewise coercive in nature, but such an expansive interpretation of the term proves too much.

We believe that the Congress used "coerce" in the section under consideration as a word of art, and that it means no more than non-judicial acts of a compelling or restraining nature, applied by way of concerted self help consisting of a strike, picketing or other economic retaliation or pressure in a background of a labor dispute. Our view is supported by the legislative history. For example, Senator Kennedy said in discussing the construction site proviso to § 8(e) on the floor of the Senate:

"Agreements by which a contractor in the construction industry promises not to subcontract work on a construction site to a nonunion contractor appear to be legal today. They will not be unlawful under section 8(e) * * * Since the proviso does not relate to section 8(b) (4), strikes and picketing to enforce the contracts excepted by the proviso will continue to be illegal under section 8(b) (4) * * *

* * * * * *

"It is not intended to change the law with respect to the judicial enforcement of these contracts, * * *."

II Leg.Hist. Labor-Management Reporting and Disclosure Act of 1959 (Gov't Printing Office) p. 1433.

This statement was necessarily made in the light of the language in the Sand Door case that because hot cargo contracts could not be enforced by means prohibited under § 8(b) (4) (A) of the Act, it did not necessarily follow that the contract might not have "legal radiations affecting the relations between the parties" in a different context.

Another leader in the debate on the amendments, Senator McClellan, alluded to this decision and shed light on the intention of the Congress when he said, after discussing the secondary boycott bill to amend § 8(b) (4), and with reference to the outlawing of hot cargo clauses:

"The Supreme Court held only last year that a union cannot invoke such a clause as a defense to an unfair labor practice complaint against the union under section 8 (b) (4) (A) of the Taft-Hartley Act. However, the court explicitly left open the question of whether such a clause might have other ramifications in labor-management relations.

"Various law-review commentators have since suggested that such a clause might still be effective to permit an action for damages or specific performance against an employer who orders his employees to perform such services, or that it might protect an employee from being discharged for refusal to carry out such orders * * *." Id. at p. 1007.

Senator Goldwater, Id., at p. 1858, in a memorandum submitted to the Senate on September 14, 1959, contemporaneous with the signing of the bill by the President, which memorandum analyzed the various provisions of the new law, stated:

"Thus, although employers and unions who are under [the construction industry] exemption [to section 8(e)] may lawfully enter into such agreements, and may re-

---

4. From the opinion of the District Court:
   "Coerce—'(1) to restrain by force, especially by law or authority; to repress, curb; (2) to compel to any action; (3) to enforce, as to coerce obedience.' Webster's New Collegiate Dictionary (1960)."

sort to the courts for their enforcement under applicable principles of contract law, no coercion or restraint—economic or otherwise—may be used by any party to such agreement, even if entered into voluntarily by both parties, to compel the other party to live up to the contract or to refrain from breaching it."

Another persuasive consideration to us is that it would have been unusual for Congress to have amended § 301(a) of the Act, vesting jurisdiction of suits for violation of contracts between an employer and a labor organization in the District Courts in any such *sub silentio* manner. This is particularly so where the contract, as here, was saved from unenforcibility by an express proviso in § 8(e).

The question under consideration has been mentioned on two occasions by the Court of Appeals for the District of Columbia, but the statement in each instance was *obiter*. In Local No. 5, United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of U. S. and Canada v. N. L. R. B., 1963, 116 U.S.App.D.C. 100, 321 F.2d 366, that court, in enforcing a Board order against a secondary boycott noted that the conclusion reached might "leave the union with a valid contract and with no means of enforcing it other than in a civil suit." Then in Orange Belt District Council of Painters No. 48 v. N. L. R. B., D.C.Cir., 1964, 328 F.2d 534, while remanding a case involving a hot cargo agreement between a union and a contractor in the construction industry for the purpose of perfecting the record, and without reaching the merits, the court stated that " * * * under Section 8(b) (4) (B) such secondary clauses may be enforced only through lawsuits, and not through economic action."

As authority to the contrary, Hardy relies on the case of Application of Apex Lumber Corp., 1958, 15 Misc.2d 15, 179 N.Y.S.2d 503, aff'd, 7 A.D.2d 920, 183 N.Y.S.2d 697. There the trial court, on motion of an employer, stayed arbitration insofar as the union sought an award in the nature of a mandatory injunction which would require the employer to engage in a secondary boycott as it had contracted to do, but refused to totally stay the arbitration on the theory that there might be other legal rights radiating from the agreement which were not then apparent to the court. On appeal the court held that it would not grant a mandatory injunction where the hot cargo clause contained no affirmative obligation on the part of the employer to direct its employees not to handle the goods of another employer. The court went on to say that even if there were such an obligation, the employer would have the choice of abiding or refusing to abide by its contract at the time it was called on to engage in the secondary boycott. Both courts relied on Sand Door and the decisions were prior to the amendments to the Act.

We are of the opinion that the courts in the Apex case misconstrued the holding of the Supreme Court in Sand Door by interpreting it to include all modes of enforcement.[5] We read Sand Door as proscribing those pressures which were statutorily unlawful at the time, i. e., under § 8(b) (4) (A), supra, and as having left the question of judicial enforcement open.

■ In sum, we cannot attribute such a random intention to the Congress as Hardy asserts. To do so would prevent the judicial enforcement of an agreement, the validity of which was expressly preserved by that body, when there is nothing in the language of the statute or in the legislative history to indicate that the doors of the courts

5. See Jones, Specific Enforcement of Hot Cargo Provisions in Collective Bargaining Agreements by Arbitration and Under § 301(a) of the Taft-Hartley Act, 6 UCLA L.Rev. 85 (1959), in support of this view, as well as in support of the principle that hot cargo clauses may be judicially enforced.

should be closed under the circumstances. Such a result is not to be lightly inferred, and we hold that the prohibited coercion in § 8(b) (4) (ii) (B) does not preclude judicial enforcement of a hot cargo clause left valid and enforceable under § 8(e) of the Act, as amended.

There was no error in dismissing the counterclaim which was based on the theory that attempted judicial enforcement amounted to coercion. We do not reach any of the other questions urged on us by Hardy. They were not considered by the District Court. Our reversal is on the sole question presented and considered in that court.

Reversed and remanded for further proceedings not inconsistent herewith.