CARRIER AIR CONDITIONING
CO., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

Sheet Metal Workers' International
Association, Local 28, AFL–CIO,
Intervenor.

No. 25, Docket 76–4046.

United States Court of Appeals,
Second Circuit.

Argued Sept. 15, 1976.

Decided Dec. 2, 1976.

**1180**

Kenneth C. McGuiness, Washington, D. C. (Robert E. Williams, Douglas S. McDowell, Washington, D. C., of counsel), for petitioner.

Michael S. Winer, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John S. Rother, Atty., N. L. R. B., of counsel), for respondent.

Sol Bogen, New York City, for intervenor.

George Miron, Washington, D. C. (Wyman, Bautzer, Rothman & Kuchel, Washington, D. C., of counsel), on brief for Air-Conditioning and Refrigeration Institute, Air Moving and Conditioning Association, American Boiler Manufacturers Association, American Consulting Engineers Council, Architectural Woodwork Institute, Associated Builders and Contractors, Inc., National Society of Professional Engineers, and National Woodwork Manufacturers Association, as amici curiae in support of petitioner.

Before SMITH, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

A respected commentator on the difficult subject of labor secondary boycotts has written that "[t]he pressures created by momentous problems of productivity and job security under changing technological and market conditions are contained or released by no more sensitive a legal instrument than a legislative determination to protect neutrals from being drawn into the disputes of others."[1] The case before us presents a classic confrontation between productivity and job security interests, with neutrals caught in the middle; the legal instrument, however far from the ideal, is sufficiently sensitive to furnish as guideposts to decision.

The productivity interest is espoused by the petitioner, Carrier Air Conditioning Co. (Carrier), the charging party before the National Labor Relations Board (the Board or NLRB); Carrier here seeks review of an NLRB order dismissing its General Counsel's complaint. The job security interest is espoused by Sheet Metal Workers' International Association, Local 28, AFL–CIO (the Union or Local 28), intervenor herein and the party against whom Carrier's charges were filed. The neutrals in this dispute are New York City area sheet metal and air conditioning contractors, who signed an agreement containing a "no subcontracting clause" that is central to this case. As enforced by the Union, the clause had the

---

1. Lesnick, *Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e)*, 113 U.Pa.L.Rev. 1000, 1041 (1965).

effect of preventing virtually all sales of a specific type of Carrier air conditioning unit—the Moduline—in New York City.

In its unfair labor practice charges, Carrier alleged that the no subcontracting clause violated § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), and that Local 28's actions in relation to the Moduline units violated § 8(b)(4), 29 U.S.C. § 158(b)(4). The Board's General Counsel issued a complaint to this effect, and an administrative law judge (ALJ) found that the Act had been violated as alleged. The NLRB reversed the ALJ, however, and dismissed the complaint. *Sheet Metal Workers Local 28 (Carrier Air Conditioning Co.)*, 222 N.L.R.B. No. 110 (1976). Carrier's petition for review of the Board's decision was duly filed in this circuit, pursuant to § 10(f) of the Act, 29 U.S.C. § 160(f).

■ In reviewing the Board's decision, we are mindful of the Supreme Court's injunction in *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967), that the determination whether Sections 8(e) and 8(b)(4) have been violated necessarily involves an inquiry into "whether, under all the surrounding circumstances, the Union's objective was preservation of work . . ., or whether the agreements and [related activities] were tactically calculated to satisfy union objectives elsewhere." Thus our attention must be directed to the remoteness of the threat to the Union of job displacement by the product at issue, the history of relations between the Union and Carrier, and the "economic personality" of the industry. *Id.* at 644, n.38, 87 S.Ct. 1250. Such an inquiry necessitates examination in depth of the facts, as to which the ALJ's findings regarding the credibility of witnesses will be adopted here, as they were by the NLRB, 222 N.L.R.B. No. 110, slip op. at 2 & n.3. This examination, coupled with the applicable law, leads us to conclude that the Board erred in various respects. We accordingly affirm in part, reverse in part, and remand for further proceedings.

## I. FACTS

In an agreement with Local 28 for the time period August 1972—June 1975,[2] the New York City Chapter of the Sheet Metal and Air Conditioning Contractors National Association (the Association) consented not to "subcontract out" work relating to, *inter alia*, "plenums," on the express ground that performance of this work by Local 28 members would help "preserv[e] . . . the work opportunities of the . . . sheet metal workers . . . within the collective bargaining unit . . ."[3] A plenum may be briefly described as a four-sided box made of sheet metal that is attached to an air conditioning unit; it helps to regulate the flow of air into a room as well as to abate noise. If an Association contractor

---

**2.** An earlier agreement, covering the period August 1969—June 1972, contained a similar provision. *See also* note 6 *infra*.

**3.** The no subcontracting clause provided in part:

> For the preservation of the work opportunities of the journeyman sheet metal workers and apprentice sheet metal workers within the collective bargaining unit, each Employer within the collective bargaining unit shall not subcontract out any item or items of work described hereinbelow, except that each said Employer shall have the right to subcontract for the manufacture, fabrication or installation of such work with any other Employer within the collective bargaining unit:
> 1. Radiator enclosures. . . .
> 2. Functional louvers.
> 3. Attenuation boxes. . . .
> 3a. Sound traps.
> 4. Dampers. . . .
> 5. Skylights, Sheet Metal Sleeves, Pressure Reducing Boxes, Volume Control Boxes, Troffers (plenums), High Pressure Fittings and Gutters (excluding ½ Round Gutters).
> 6. Air handling units in excess of 30,000 C.F.M.'s.
> 7. All other work historically, traditionally and customarily performed by journeyman sheet metal workers and apprentice sheet metal workers within the collective bargaining unit in accordance with the collective bargaining agreement.
>
> All the work described in this "no subcontracting clause" shall be performed by journeyman and/or apprentice sheet metal workers in the bargaining unit covered by this Agreement.

were to violate the agreement by subcontracting out work on plenums to employers other than those within the collective bargaining unit, the agreement provided for censure for the first offense and for the imposition of a fine, "commensurate with the loss . . . sustained by journeyman sheet metal workers by reason of such violation," for subsequent offenses. The amount of the "loss sustained" was to be determined by a Joint Adjustment Board established by the contract, the Board consisting of twelve members designated by the Association and twelve by the Union.

The plenums of concern here are attached to the type of Carrier air conditioner known as the Moduline, which the ALJ found was "a new and different product." Opinion of James V. Constantine, *Administrative Law Judge,* slip op. at 21 [hereinafter cited as ALJ's Opinion]. The Moduline units are installed in ceilings and connected by ducts to a central fan room, where outside air is drawn into the building, conditioned, and forced by fan pressure through the ducts to the Moduline units. Air passes through the plenum portion of the unit and thence, by virtue of the plenum's air pressure being higher than room pressure, through a distribution baffle, past a bellows, and ultimately into a room through a diffuser. The entire Moduline unit, except for the diffuser slots, is concealed in the ceiling.

Carrier began marketing the first model of the Moduline series, Model 37P, in the early 1960s and around 1970 developed a more sophisticated unit known as Model 37A. Presently both types of units are marketed throughout the United States, except in New York City, and are installed with plenums that are prefabricated and attached at Carrier's Tyler, Texas, plant,[4] whose workers are organized by another local of the same international union here involved.

In reaching the conclusion that the Moduline is a "new" product, the ALJ evidently credited testimony by Carrier's "engineer-ing section manager" for Modulines to the effect that attaching the plenum to the control unit is a far more complex operation on the Moduline than it is on conventional air conditioning units. *See* ALJ's Opinion at 11, 22. Specifically, the manager testified that the process of calibration, by which the bellows assembly is adjusted to assure proper plenum pressure and air flow, is the "whole heart" of the Moduline and that it requires the use of special calibration machines located only at the Texas plant. He further testified that Carrier's Texas plant is specifically designed to manufacture Modulines with the plenums attached, that the Texas personnel have been specially trained to perform the plenum calibrations, and that "it would be extremely difficult" to fabricate plenums and attach them to Modulines outside the Carrier Moduline plant. This difficulty is the greater on the more sophisticated Model 37A, because its "bellows assembly . . . is a part of the plenum [and] has to be attached to the plenum in order to be adjusted or calibrated."

The evidence credited by the ALJ indicates that Local 28 has consistently opposed installation of Modulines in the New York area. Carrier first sought to install the Model 37P units in 1966 in a hospital project and in Carrier's own offices in Manhattan. At a meeting late in that year, Local 28 officials told Carrier's district manager that the Modulines "could not come into New York" unless the plenums were made in New York in a shop affiliated with Local 28. When some of the 37P units were delivered in early 1967, the union officials stated that they could not be installed. A few days later, the officials and Carrier's district manager reached an agreement under which the Union would allow Modulines to be installed in the hospital project and Carrier's offices in exchange for Carrier's attempting to redesign the 37P so that the plenum could be made in New York and later joined to the remainder of the unit.

---

**4.** The parties stipulated below that sheet metal workers locals in all areas of the country except New York have allowed, without objec-tion, installation of Modulines with prefabricated plenums.

In late 1967 and 1968, the redesigned 37P was given its first test. After union officials objected to installation of 37Ps with prefabricated plenums in a Manhattan police office building, Carrier agreed to have the plenums manufactured by a New York sheet metal company whose employees were represented by Local 28. The plenums so manufactured, however, did not fit properly, leaked air, and were noisy; as a result, Carrier, which had guaranteed to the City the proper functioning of the units, was obliged to spend $10,000 correcting the defects. The ALJ found that the same problem occurred on a few other small projects in the late 1960s as to which, pursuant to Carrier's agreement with Local 28, plenums were made in New York and joined to the Texas-made control unit. The ALJ concluded that New York area sheet metal contractors were "[unable] . . . to fabricate a workable plenum." ALJ's Opinion at 22. Carrier's district manager, in testimony credited by the ALJ, see id., explained the business result of this inability in simple terms: "We just couldn't sell the [redesigned] unit."

In mid-1970, following the unveiling of the new Model 37A Moduline, Carrier spokesmen met with Union officials in an attempt to convince them that the new models should be allowed into New York with their prefabricated plenums. Carrier argued that the Model 37A could not be produced without a plenum installed at the factory. Meetings went on for over two years without any resolution of the dispute until, in October, 1972, following a change in Union leadership, the new president referred the issue to a Union "research and review committee," composed of three Local 28 members who were recognized experts in the sheet metal industry.

In October, 1972, the committee submitted a report unanimously recommending that the Union *accept* Modulines with prefabricated plenums. A principal reason for this recommendation was the committee's belief that use of Modulines in New York would result in *increased* work opportunities for Local 28 members. This was true because the Moduline system requires an extensive network of distribution ducts, which would be installed by sheet metal workers, whereas alternative systems either cool by water circulation, which involves primarily work for plumbers, or utilize rooftop units, which require little duct work. A few months later, a study by the New York sheet metal industry reached similar conclusions.

While Local 28's president endorsed the committee report, on submission to the Union's executive board, the report was rejected. The executive board recommended that the Union continue to oppose installation of Modulines with prefabricated plenums, and this recommendation was adopted by the Local 28 membership in June, 1973. A few months earlier, in a related proceeding, a sheet metal industry representative had asked the Joint Adjustment Board, established by the Union-Association agreement, to modify the agreement to allow at least a "pilot project" using Modulines. This proposal was rejected by both the Joint Adjustment Board and the Union's executive board.

In mid-1973, a construction contract was awarded for the Van Etten Drug Treatment Center in the Bronx, New York. The architects for this project specified the use of Carrier Modulines or their equivalent, and 92 Model 37A units were duly ordered. In October, 1973, a member of Local 28, a "sketcher" employed by the subcontractor who was to install the units, erased the Modulines from the blueprint drawings he was assigned to prepare. This led to a telephone conversation between Carrier's district manager and Local 28's president; the ALJ credited the manager's version of this conversation. ALJ's Opinion at 23. In this version, the Union president confirmed that he had "refused to let them sketch the [Van Etten] job" and that he would "not permit this [Moduline] unit to come . . . into New York." Shortly thereafter, Carrier filed the first of the unfair labor practice charges that have culminated in the case before us. Over the next few months, the parties continued discussions and eventually

reached an agreement under which Local 28 allowed installation of Modulines on the Van Etten job in exchange for Carrier asking the NLRB not to proceed on its unfair labor practice charge until after the Union election in July, 1974.

During the first half of 1974, Carrier Moduline units were also specified by architects on another job, known as the "Babies Hospital Addition" to Columbia Presbyterian Hospital, and were duly ordered. The subcontractor who was to install the units, General Sheet Metal, Inc. (General), was a member of the Association and thus bound by the Association's agreement with Local 28, but nevertheless agreed to install the Modulines with prefabricated plenums. Following the election of a new Union president in July, the Union reviewed its position, decided to "insist" that the agreement be enforced "as written," and filed charges against General with the Joint Adjustment Board, alleging that General had accepted work in violation of the agreement. The remedy proposed by the Union was the payment by General into the Local 28 Sick Dues Relief Fund of $2,153.60, a sum claimed to represent the actual wage loss to the Union caused by the use of prefabricated plenums. Shortly thereafter, General ceased installation of the Modulines. Before the Joint Adjustment Board could act on the grievance, General, in March, 1975, paid the requested sum into the Union's fund and resumed installation of the Moduline units at the hospital. Carrier, however, reimbursed General for the full amount of the settlement payment, pursuant to an agreement between them.

## II. SECTION 8(e)

■ Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), makes it an unfair labor practice for a union and an employer "to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person . . . ."[5] A brief review of the history of the section is helpful in understanding the nature of the issues presented here. When passed in 1959, as part of the Landrum-Griffin amendments to the National Labor Relations Act, § 8(e) was designed to close a loophole in the secondary boycott provisions of the Act. In *Local 1976, United Brotherhood of Carpenters v. NLRB (Sand Door)*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), the Supreme Court had stated that an employer's voluntary execution or observance of a contractual provision not to handle nonunion material (known as a "hot cargo" clause because of its wide use in Teamsters Union contracts) was not a violation of the Act. By passing § 8(e) in response to the *Sand Door* decision, Congress made such contractual provisions themselves unlawful. *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 634, 87 S.Ct. 1250. At the same time, however, it retained the distinction between contractual provisions and actions with a secondary purpose and those intended by employees "to preserve for themselves work traditionally done by them." *Id.* at 635, 87 S.Ct. at 1263. *See* Lesnick, *Job Security and Secondary Boycotts: The Reach of NLRB §§ 8(b)(4) and 8(e)*, 113 U.Pa.L.Rev. 1000, 1013 (1965); Note, *Work Preservation and the Secondary Boycott—An Examination of the Decisional Law Since National Woodwork,* 21 Syracuse L.Rev. 907, 909–10 (1970). In short, § 8(e) was directed against "agreements which obligated neutral employers not to do business with other employers involved in labor disputes with the union," 386 U.S. at 636, 87 S.Ct. at 1264, but not against "primary

---

**5.** A proviso to § 8(e) excepts from the proscriptions of that subsection agreements relating to the contracting or subcontracting of onsite construction work. But the proviso does not cover work done elsewhere than on a construction jobsite. *Connell Constr. Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 630, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 638–39, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). All parties apparently concede that the proviso is not applicable here, because the work in question, fabrication of plenums, would have been done in offsite sheet metal shops.

work preservation agreements," *id.* at 639, 87 S.Ct. 1250. But the line between the two types of agreements, however clear in the abstract, often becomes indistinct when the statute is applied to concrete facts. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 386–87, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (Harlan, J..) (lines "separating 'primary' from 'secondary' activities" are "arbitrary, tenuous, and shifting"); *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 645, 87 S.Ct. at 1268. *See also NLRB v. National Maritime Union,* 486 F.2d 907, 911–12 (2d Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

▆ The Board's brief argues that, in deciding whether the agreement between the Union and the Association had a work preservation objective or instead was "tactically calculated to satisfy union objectives elsewhere," 386 U.S. at 644, 87 S.Ct. at 1268, we are limited to considering the words of the agreement and the circumstances surrounding the making of the agreement. We find such a limitation untenable. On an issue like this one, words in an agreement will often amount to little more than routine recitations in anticipation of future litigation, such as the reference to work preservation in the agreement in the instant case, *see* note 3 *supra.*[6] Moreover, Congress, in passing § 8(e), made clear its intention to proscribe, in the wake of *Sand Door,* not merely the signing of a "hot cargo" agreement, but also voluntary employer adherence to such an agreement.

*See National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 634, 87 S.Ct. 1250; Leslie, *Right to Control: A Study in Secondary Boycotts and Labor Antitrust,* 89 Harv.L.Rev. 904, 913–14 & n. 37 (1976). While there may be a few situations in which an approach testing the relevant contractual provision as it has been applied could cause otherwise valid agreements to be invalidated because of one illegal union action, *see Sheet Metal Workers Local 223 v. NLRB,* 162 U.S.App.D.C. 145, 498 F.2d 687, 697 (1974), this case does not present such. We agree with the Ninth Circuit that a facially valid agreement may be invalid for § 8(e) purposes in particular factual contexts. *Associated General Contractors v. NLRB,* 514 F.2d 433, 439 (9th Cir. 1975). In its other applications, the same agreement may retain its validity. *See* Leslie, *supra,* 89 Harv.L.Rev. at 914.

▆ Our analysis regarding the congressional purpose underlying § 8(e) also helps to explain why the § 8(e) charge is not barred by § 10(b) of the Act, 29 U.S.C. § 160(b), which establishes a six-month limitation period between the occurrence of an unfair labor practice and the filing of a charge with the NLRB.[7] The statute proscribes only "enter[ing] into" certain agreements, and, if this language were taken to mean that only the signing were prohibited, the six-month period would have passed here long before Carrier filed an unfair labor practice charge. The "enter into" language of § 8(e) has not been so construed, however. Instead, this court and others, as well as the NLRB, have held that

---

6. The work preservation references at the beginning of the no subcontracting clause and in numbered paragraph 7 thereof are complemented by the last paragraph, which provides that all work for which subcontracting is proscribed shall be performed by Local 28 members. *See* note 3 *supra.* The last paragraph was not contained in the earlier, 1969–1972 agreement; the Union's counsel indicated to the ALJ that the paragraph was added to emphasize the Union's work preservation goals. The emphasis was hardly necessary for purposes of the agreement, however, since the Association members were already bound, by the preceding paragraph of the clause, to do the specified work in their own or other Local

28-organized shops. One can only surmise that the added language was window dressing, intended to impress, perhaps, the potential arbiters of any § 8(e) dispute that might arise—the ALJ, the NLRB, or the members of a reviewing court.

7. Section 10(b), 29 U.S.C. § 160(b), provides in pertinent part:

[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . . .

a union may "reaffirm" an agreement, and thus, in effect, "re-enter" into it, by seeking to enforce it, at least when the enforcement effort itself appears to have a secondary objective. *Danielson v. International Organization of Masters, Mates & Pilots,* 521 F.2d 747, 754 (2d Cir. 1975); *NLRB v. Local 28, Sheet Metal Workers,* 380 F.2d 827, 829–30 (2d Cir. 1967); *Los Angeles Mailers Union No. 9 v. NLRB,* 114 U.S.App.D.C. 72, 311 F.2d 121, 123 (1962) ("To seek to give it life is in substance to seek to have it agreed to, which is no different in substance from seeking to have it entered into"); *Bricklayers & Stone Mason Local 2 (Associated General Contractors),* 224 N.L.R.B. No. 132, slip op. at 11–13 (1976). *See also NLRB v. International Brotherhood of Electrical Workers,* 405 F.2d 159, 164 (9th Cir. 1968) (construing "enter into" language of § 8(b)(4) ), *cert. denied,* 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969); *NLRB v. Milk Wagon Drivers' Local 753,* 335 F.2d

326, 329 (7th Cir. 1964) (same). Because we conclude, as discussed below, that Local 28's contract enforcement efforts here had a secondary objective, we hold that the § 10(b) limitation period does not bar a finding that § 8(e) has been violated in this case. Moreover, once the possibility of a violation within the six-month period is recognized, "earlier events may be utilized to shed light on the true character of matters occurring within the limitations period . . . ." *Local 1424, International Association of Machinists v. NLRB,* 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960) (Harlan, J.).[8]

 Turning to the question whether, as applied by the Union in this case, the no subcontracting clause had a valid work preservation purpose or a proscribed secondary purpose, we believe that the facts recited at length above leave no doubt that the object was Carrier and the objective secondary, a conclusion also reached by the ALJ.[9] The Union conceded, before both the

---

**8.** The Board also argues here that the "enter into" language of § 8(e) requires a showing of a "bilateral agreement," whereas in the instant case the Union acted unilaterally. This argument was not alluded to in the Board's opinion below—indeed, the opinion did not analyze § 8(e), *see* note 9 *infra*—and is thus in the nature of a post hoc rationalization. Moreover, if addressed to the fact that only the Union really cared about enforcing the no subcontracting clause, the argument proves too much, since this must be true of all "hot cargo" agreements.

If addressed to a situation in which an employer signs an agreement and then is reluctant to comply with it, the argument is simply wrong as to both the facts and the law. The signatory Association here joined with the Union in April, 1973, in rejecting, through the Joint Adjustment Board (on which they had equal representation), a proposal to modify the agreement to allow the introduction of Modulines in New York. Moreover, in connection with the Babies Hospital job, General, a member of the Association, acquiesced in the Union's interpretation of the agreement to the extent of paying the full sum requested by the Union in March, 1975; while Carrier reimbursed General, it did so only because General refused to proceed with installation of the Modulines until the grievance was settled. To the extent that an interpretation of an agreement is reflected in actions, therefore, it seems clear that the anti-Moduline interpretation here was a bilateral one. Finally, even if no acquiescence at all by the sheet metal contractors

could be found, this fact would not affect the agreement's validity under § 8(e). This court has recently held that a union can unilaterally reaffirm an agreement violative of § 8(e) merely by making a demand for compliance; actual compliance by the signatory employer need not be shown. *Danielson v. International Organization of Masters, Mates & Pilots,* 521 F.2d 747, 754 n.8 (2d Cir. 1975).

**9.** The Board argues that it did not reach the primary/secondary and work preservation questions in relation to the § 8(e) charge (and the § 8(b)(4) charges) and that, if this court holds the questions must be reached, we should remand to the Board for further findings on these questions. We believe the Board did reach the questions, albeit implicitly, and that in any event such a remand would serve no purpose. The Board was quite cryptic—not to say Delphic—in its fiat that § 8(e) had not been violated by the no subcontracting clause either as written or as applied, *see* 222 N.L.R.B. No. 110, slip op. at 12 & n. 10; *cf. Oil, Chemical & Atomic Workers Local 4 243 v. NLRB,* 124 U.S.App.D.C. 113, 362 F.2d 943, 946 (1966) (Board has obligation to state reasons for its disagreement with ALJ), but, given the *National Woodwork* test quoted *supra* which the Board's brief recognizes as governing, a determination as to the primary/secondary or work preservation nature of an agreement is implicit in every § 8(e) decision. Even if the Board had not reached the issue, moreover, additional findings would be of little assistance in resolving it. The ALJ's findings of fact, which were

ALJ and the Board, that its principal dispute was with Carrier, but, rather than applying leverage directly against Carrier, the Union relied on the no subcontracting clause in its agreement with the Association to keep Modulines out of New York. Such reliance would have been permissible if the Union's purpose was work preservation, but this was not the case. It may be true, as the Board found, that "Local 28 members have traditionally fabricated and installed the plenums on *conventional* air-conditioning units." [10] 222 N.L.R.B. No. 110, slip op. at 5 (emphasis added). As the ALJ found, however, the Moduline is not a "conventional" unit, but rather is "a new and different product," and fabrication of the Moduline plenums "is not work traditionally and historically performed" by members of Local 28. ALJ's Opinion at 21. *Compare National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 646, 87 S.Ct. 1250. Support for this view can be found in the fact that, when the Moduline was redesigned to allow separate fabrication of plenums in New York,[11] the precision calibra-

tion required simply could not be accomplished satisfactorily.

It is thus appropriate that, in assessing the legal significance of the agreement's prohibition on subcontracting work related to "plenums," a distinction be made between the plenums on conventional air conditioning units and those on Moduline units. While, with regard to other plenums, the no subcontracting clause may have served a valid work preservation purpose, as applied to *Moduline* plenums—part of a new type of air conditioner—the no subcontracting clause served only to aid Local 28 in "'trying to acquire work performed by employees' of Carrier in Tyler, Texas." ALJ's Opinion at 21, *quoting Associated General Contractors v. NLRB, supra,* 514 F.2d at 438. In Justice Harlan's words, this is "a case of a union seeking to restrict by contract . . . an employer with respect to the products he uses, for the purpose of acquiring for its members work that had not previously been theirs." *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 648, 87 S.Ct. at 1270 (concurring memorandum).[12]

essentially accepted by the Board, show a pattern of secondary activity and a purpose other than work preservation, which he found more than sufficient for § 8(e) purposes, a conclusion with which we agree. While the Board's expertise on matters within its special competence is of course entitled to deference from this court, *see, e. g., NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266–67, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), the Board's findings are of less value when we have before us the findings of the Board's own hearing officer, *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and when the questions of law are so interrelated with the facts of the case and require for their resolution common sense as much as legal erudition, *see NLRB v. Universal Camera Corp.,* 190 F.2d 429, 430 (2d Cir. 1951) (on remand) (L. Hand, *J.*). *See also NLRB v. Local 825, International Union of Operating Engineers,* 400 U.S. 297, 303, 91 S.Ct. 402, 407, 27 L.Ed.2d 398 (1971) ("here the normally difficult task of classifying union conduct [as primary or secondary] is easy"). As did the Ninth Circuit, we agree with the ALJ on matters that the Board purportedly did not reach. *Associated General Contractors v. NLRB,* 514 F.2d 433, 438–39 & n. 7 (9th Cir. 1975).

**10.** Even this statement is open to doubt, at least if it is taken to suggest that Local 28

members fabricated plenums on *all* other units in New York. Carrier's district manager testified—and the Union did not challenge his testimony on this point—that "literally hundreds of thousands" of Carrier units other than Modulines have been installed in New York, in buildings as large as the World Trade Center, with plenums prefabricated at Carrier's Texas plant. Local 28 members installed these units without objection.

**11.** The few isolated instances in which Local 28 members fabricated Moduline plenums are not, of course, any evidence of such work being "traditionally" performed by Local 28, as the ALJ recognized, ALJ's Opinion at 23. Rather, those instances occurred only because Carrier was seeking to settle the dispute with Local 28 that is the subject of the instant case.

**12.** Because we find ample direct evidence of the no subcontracting clause's secondary purpose, unrelated to work preservation, we need not consider whether such a purpose may be inferred on the basis that the Association members here lacked the "right to control" the work sought by the Union. The Board's "right to control" test has been highly controversial, *compare* majority, concurring, and dissenting opinions in *Enterprise Association of Steamfitters Local 638 v. NLRB,* 172 U.S.App.D.C. 225,

## III. SECTION 8(b)(4)

While often described as a "secondary boycott" section of the Act, *see, e. g., NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 686, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), § 8(b)(4) in fact proscribes, not all secondary boycotts, but rather "specific union conduct directed to specific objectives," *Local 1976, United Brotherhood of Carpenters v. NLRB,* 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1958). It does so, moreover, in relatively precise terms, *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra,* 394 U.S. at 388, 89 S.Ct. 1109, and the words of the statute must thus be the courts' principal referent in determining whether the section has been violated, *Local 1976, United Brotherhood of Carpenters v. NLRB, supra,* 357 U.S. at 100, 78 S.Ct. 1011. While specific, however, the section, with its clauses, subclauses, and provisos, is quite difficult to follow; instead of setting out the exact statutory language in the margin, we have reproduced there a useful "roadmap" to § 8(b)(4).[13]

Before a violation of § 8(b)(4)(B) can be found, two separate determinations must be made. One relates to the *nature* of the union's conduct: whether the union or its agents engaged in, induced or encouraged a refusal to perform services (§ 8(b)(4)(i)) or threatened, coerced or restrained any person (§ 8(b)(4)(ii)). The second relates to the *purpose* of the Union's conduct: whether an object was to force any person to cease handling the products of, or doing business with, another. We discuss the first of these issues in detail below, considering separately the alleged violations of clauses (i) and (ii). With regard to the purpose issue, however, our conclusion in the § 8(e) discussion as to the secondary focus of Local 28's activities is equally applicable here. The type of contract prohibited by § 8(e) is one in which

521 F.2d 885 (1975) (en banc, 5–4), *cert. granted,* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976), has been rejected explicitly by five circuits and perhaps implicitly by our own, *see* citations in *id.* at 888–89 & n. 3, and was the subject of recent argument before the Supreme Court, *see* 45 U.S.L.W. 3276 (U.S. Oct. 6, 1976) (argument in No. 75–777, *NLRB v. Enterprise Association of Steamfitters Local 638, supra* ). In the *Enterprise Association* case, moreover, unlike the instant one, the Board and the court of appeals agreed that the purpose of the union's activities was the preservation of work traditionally performed by its members. 521 F.2d at 888, 900.

**13.** The following diagram of § 8(b)(4) was developed by Professor David Feller for use in his labor law courses at the University of California at Berkeley:

Diagram of Section 8(b)(4)(A) and (B)

the employer agrees to do that which § 8(b)(4)(B) prohibits the union from attempting to force the employer to do; the language of the former subsection "closely tracks" that of the latter. *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 635, 87 S.Ct. 1250; *see id.* at 649, 87 S.Ct. 1250 (Harlan, J., concurring), 660, 87 S.Ct. 1250 (Stewart, J., dissenting). On the basis of facts detailed at length above and our analysis of them in the § 8(e) discussion, we hold that "an object" of Local 28's activities was forcing sheet metal subcontractors to cease handling Carrier Moduline units.

The ALJ made a similar holding as to the secondary purpose of Local 28's conduct and went on to find violations of both § 8(b)(4)(i)(B) and § 8(b)(4)(ii)(B). The Board disagreed as to both violations. We affirm the Board as to (i) and reverse as to (ii).

### A. *Section 8(b)(4)(i)(B)*

■ The Board found the evidence insufficient to establish that Local 28 or its agents had "induce[d] or encourage[d]" employees to refuse to perform services, § 8(b)(4)(i), 29 U.S.C. § 158(b)(4)(i); *see* 222 N.L.R.B. No. 110, slip op. at 12–13, a conclusion with which we agree. The record contains one statement that might be construed as evidence of an attempt by Local 28 to induce its members to refuse to perform services. In connection with the Van Etten Drug Treatment Center, after a member of Local 28 had erased Modulines from blueprints, Carrier's district manager said to the Union president (according to the manager's account, credited by the ALJ), "I understand you have refused to let them sketch the job," to which the president replied, "That's so." The Board found this statement to be ambiguous; we find it to be less so, but note that its weight is substantially undermined by its hearsay nature and by the fact that it represents what an interested party (Carrier's district mana-

ger) remembers about a phone conversation that occurred one and a half years prior to the time that he recounted it in testimony. Even if the statement were entirely accepted, moreover, it is a poor substitute for direct evidence that Union officials actually told the sketcher that he should erase the Modulines. The record does not indicate that either the Union president or the sketcher was asked about what steps, if any, the president took to effectuate his alleged refusal "to let them sketch the job."

Other than the sketching incident on the Van Etten job, there is no evidence that Local 28 members ever refused to perform services for reasons related to the use of Carrier Modulines.[14] While such evidence is not required to establish a violation of § 8(b)(4)(i)(B), since it is the inducement or encouragement itself that is proscribed, *NLRB v. Associated Musicians Local 802,* 226 F.2d 900, 904–05 (2d Cir. 1955), *cert. denied,* 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956), evidence of this sort would certainly have made it easier to infer that a violation had occurred.

■ Of greater importance is the fact that, other than the Union president's refusal "to let them sketch the job," there is no evidence that Local 28 officials did in any way encourage employees to refuse to perform services. The ALJ cited, as evidence of such encouragement, the resolution, passed by the Union's executive board and adopted by the membership, that refused to modify the agreement to allow installation of Modulines. ALJ's Opinion at 23. We share the NLRB's view that this resolution "merely asked the union members to decide whether their contractual rights should be waived" and that it did not suggest "that the contract would be enforced by proscribed economic action." 222 N.L.R.B. No. 110, slip op. at 10–11. A resolution of this sort—containing a statement of policy but not recommending, explicitly or implicitly, that the policy be enforced by a

14. When Moduline installation work stopped on the Babies Hospital Addition, it was the result of a decision, not by Local 28 members, but by the president of General, the sheet metal

subcontractor, acting in response to the grievance filed by the Union. *See* ALJ's Opinion at 18–19.

refusal to perform services—simply is not the type of inducement or encouragement that § 8(b)(4)(i)(B) makes illegal. *See NLRB v. Local 751, United Brotherhood of Carpenters*, 285 F.2d 633, 640 (9th Cir. 1960) (resolution withholding any recommendation or direction as to a course of action).

B. *Section 8(b)(4)(ii)(B)*

Because we have already held that the Union's conduct had a secondary purpose, the only issue remaining is whether that conduct amounted to the threats, coercion, or restraint prohibited by clause (ii). The Board reasoned that the Union's repeated statements about not allowing Modulines with prefabricated plenums into New York and the Union's invocation of the contractual grievance procedure against General were "merely" attempts to enforce the no subcontracting clause " 'through peaceful means provided by the agreement and by no other means.' " 222 N.L.R.B. No. 110, slip op. at 12, *quoting Southern California Pipe Trades District Council No. 16 (Associated General Contractors)*, 207 N.L.R.B. 698, 699 (1973), *reversed sub nom. Associated General Contractors v. NLRB*, 514 F.2d 433 (9th Cir. 1975). The Board's approach of equating all peaceful, contractually allowed means with noncoercive or non-threatening means was rejected by the Ninth Circuit in *Associated General Contractors*, 514 F.2d at 438–39, as the Board recognized but was unconcerned with here, 222 N.L.R.B. No. 110, slip op. at 12 n. 9. We agree with the Ninth Circuit and accordingly reverse the Board.

The Board's approach fails to distinguish among various ways in which an agreement may be enforced. Resort to the courts for enforcement of a contract provision, while undoubtedly a somewhat coercive act, *see Local 48, Sheet Metal Workers v. Hardy*

*Corp.*, 332 F.2d 682, 686 (5th Cir. 1964), does not, to be sure, constitute the sort of coercion that Congress intended to make unlawful. *See, e. g., Acco Construction Equipment, Inc. v. NLRB*, 511 F.2d 848, 852 (9th Cir. 1975) (dictum); *Local 48, Sheet Metal Workers v. Hardy Corp., supra*, 332 F.2d at 686–87 (extensive citation of legislative history); *Orange Belt District Council of Painters No. 48 v. NLRB*, 117 U.S.App.D.C. 233, 328 F.2d 534, 537 (1964) (dictum).[15] When a contract specifies enforcement procedures that are not judicial in nature, however, nothing in the Act, the legislative history, or judicial decisions precludes a court from characterizing as threats or coercion what any layman would call by those names. Indeed, the legislative history and the decisions on point indicate that Local 28's actions here must be considered conduct violative of § 8(b)(4)(ii).

The Board's apparent position—that contractually based "peaceful means" of seeking a secondary end are legal—is contradicted by the legislative history, which evinces Congress's intention to outlaw a fairly broad range of economic pressure tactics. In introducing the bill that eventually became known as the Landrum-Griffin Act, Representative Griffin told the House:

> The courts . . . have held that . . . [a union] may threaten the secondary employer, himself, with a strike *or other economic retaliation* in order to force him to cease doing business with a primary employer with whom the union has a dispute. This bill makes such coercion unlawful by the insertion of a clause 4(ii). . . .

105 Cong.Rec. H13,092 (daily ed. July 27, 1959), *reprinted in* 2 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, at 1523 (emphasis added). Similarly, Senator Goldwater,

---

15. Even when the contract provision in question is invalid under § 8(e), as is the one here, resort to the courts should not be considered § 8(b)(4)(ii) coercion. To hold otherwise would be to give the word "coerce" in effect two meanings, since identical acts would be legal in some circumstances and illegal in others, with the determination of legality made after the fact in relation to another statute. *See* Leslie, *Right to Control: A Study in Secondary Boycotts and Labor Antitrust*, 89 Harv.L.Rev. 904, 913 (1976). Of course, resort to the courts to enforce a provision invalid under § 8(e) will almost always be futile, given the section's declaration that such provisions are "unenforcible [sic] and void."

in an "analysis" submitted to the Senate on the day the President signed the Landrum-Griffin Act, said:

> Thus, although employers and unions . . . may lawfully enter into such agreements, and may resort to the courts for their enforcement under applicable principles of contract law, no coercion or restraint—*economic or otherwise*—may be used by any party to such agreement, even if entered into voluntarily by both parties, to compel the other party to live up to the contract or to refrain from breaching it.

105 Cong.Rec. A8524 (daily ed. Oct. 2, 1959), *reprinted in* 2 NLRB, supra, at 1858 (emphasis added). Numerous court decisions since passage of the Act have reached similar conclusions after examining the legislative history. *See, e. g., NLRB v. Fruit & Vegetable Packers Local 760,* 377 U.S. 58, 68, 84 S.Ct. 1063, 1069, 12 L.Ed.2d 129 (1964) ("the prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise"); *NLRB v. Local 445,* 473 F.2d 249, 253 (2d Cir. 1973) (provision allowing union to enforce lawful hot cargo agreement "by the use of economic force" held invalid under § 8(e), because "Congress intended that enforcement of such provisions may be effected only through the courts"); *Local 644, United Brotherhood of Carpenters v. NLRB,* 533 F.2d 1136, 1145 (D.C.Cir.1975), *quoting Orange Belt District Council of Painters No. 48 v. NLRB, supra,* 328 F.2d at 537; *Associated General Contractors v. NLRB, supra,* 514 F.2d at 438 ("when Congress used 'coerce' in Section 8(b)(4)(B) it . . . intended to reach any form of economic pressure of a compelling or restraining nature"); *Local 48, Sheet Metal Workers v. Hardy Corp., supra,* 332 F.2d at 686 (term "coerce" was meant to encompass "non-judicial acts of a compelling or restraining nature, . . . consisting of a strike, picketing or other economic retaliation or pressure"); *NLRB v. Local 825, International Union of Operating Engineers,* 315 F.2d 695, 697 & n. 3 (3d Cir. 1963).

 In its brief here, the Board adopts a position that its opinion did not take below. Conceding that the use of a wide range of economic sanctions is proscribed by § 8(b)(4)(ii)—a concession that is virtually unavoidable in light of the authorities discussed in the preceding paragraph—the Board argues that this case involves "not economic retaliation but an agreed upon arbitral procedure for compensation for a breach of contract." It then goes on to argue that, because of the similarities between court proceedings and arbitration, resort to the latter should be treated like resort to the former for purposes of § 8(b)(4)(ii). We need not decide whether resort to bona fide arbitration procedures would constitute unlawful coercion, although it should be noted that the Board's premise of relevant similarities between judicial and arbitral forums is open to serious question, *see Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 57–58, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

We find instead that the contract here did not involve the equivalent of bona fide arbitration. The contractual procedures under which General paid a fine—and pursuant to which other subcontractors were doubtless deterred from accepting work involving Modulines, thus enabling the Union to effectuate its repeated threat to Carrier to keep Modulines out of New York—were to be implemented by the "Joint Adjustment Board" of 24 members, half from the Union, half from the subcontractors' association. The factors that give true arbitration some resemblance to a court proceeding, particularly the presence of a neutral factfinder with no stake in the outcome of the dispute, were conspicuously absent here. The Supreme Court has recently emphasized the courts' obligation to scrutinize with care even arbitration proceedings that superficially appear regular in all respects. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 571, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). It follows, a fortiori, that when a contractual grievance procedure does not

resemble arbitration, we should not so characterize it.

The fines authorized by the agreement here plainly were applied, or were threatened to be applied, in a way that gave the Union economic leverage over the subcontractors. And, as in *Associated General Contractors, supra,* that leverage "had the desired effect of pressuring [subcontractors] to pressure others to change their business practices." 514 F.2d at 439. It makes no difference that the subcontractors as a group would have formally joined with the Union, through the Joint Adjustment Board, in imposing the fines; as applied to the individual subcontractor, the fines were unquestionably coercive, as is demonstrated by the case of General, which stopped work on the Babies Hospital Addition as soon as a fine was threatened. *See id.* at 436, 439 (fines imposed by a similar joint board); *cf.* Leslie, *supra,* 89 Harv.L.Rev. at 912 & n. 28 (suggesting interest of subcontractors as a group in policing compliance of individual subcontractors). Moreover, while the interpretation of the agreement to exclude Modulines was a joint one on the part of the Union and the Association, *see* note 8 *supra,* the initiative for all of the anti-Moduline efforts came from the Union acting unilaterally, making the Union's role in the economic coercion as clear as it could ever be. *See Acco Construction Equipment, Inc. v. NLRB, supra,* 511 F.2d at 852 ("unilateral fining" by union constitutes "coercive economic pressure"); *NLRB v. International Brotherhood of Electrical Workers, supra,* 405 F.2d at 163 ("unilateral rescission" by union is "a form of prohibited economic coercion"). We accordingly find that the Board erred in its holding that Local 28 had not violated § 8(b)(4)(ii)(B).

Order affirmed in part and reversed in part. Case remanded to NLRB for proceedings not inconsistent with this opinion.

SMITH, Circuit Judge (dissenting):

I respectfully dissent. While I agree that we should reject the six-month limitation claim, *Danielson v. International Organization of Masters, Mates & Pilots,* 521 F.2d 747, 754 (2d Cir. 1975); *NLRB v. Local 28, Sheet Metal Workers,* 380 F.2d 827 (2d Cir. 1967), and that we should reject the Board's reversal of the Administrative Law Judge as to coercion, I would remand for further findings. It can be argued with some basis in the record that the contract provisions barring prefab units in air conditioning equipment unless assembled in Local 28 shops is a work preservation device under *National Woodwork Manufacturers Ass'n v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Local 28 is not really trying to improve the lot of Carrier's employees in Tyler, Texas but to maintain employment in New York for Local 28 people in putting together the plenums. *See NLRB v. Local 28, supra.*

The Board might well find that the plenum was not a new product but one within the competence and experience of the New York subcontractors and the members of Local 28.[1]

The Board could therefore have found that the union's objective was preservation of work. Since the Board found the union's actions not coercive, it did not reach this issue.

I agree with the majority that the Board's finding of lack of coercion (which the Board based on the Board's puzzling "peaceful means" test) cannot be sustained. The work preservation issue, however, remains and we should have the benefit of the Board's consideration of this issue before finally disposing of the matter.

I would reverse the Board on the coercive nature of the union's actions, and remand for findings on the work preservation issue.

---

1. See the testimony as to the Staten Island Community College job in 1970 set forth in the Administrative Law Judge's opinion (Appendix at 17–18).