617 F.2d 1234
 103 L.R.R.M. (BNA) 2605, 87 Lab.Cas. P 11,828
 GEORGE E. HOFFMAN & SONS, INC., a Corporation of the State
of Delaware, Plaintiff-Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN & HELPERS OF AMERICA, LOCAL NO. 627,
a Labor Organization, Defendant-Appellee.
 No. 78-2521.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 6, 1979.
Decided Feb. 6, 1980.
As Modified on Denial of Rehearing March 31, 1980.
 
 Karl W. Grabemann, Chicago, Ill., for plaintiff-appellant.
 Gerry M. Miller, Milwaukee, Wis., for defendant-appellee.
 Before TONE and WOOD, Circuit Judges, and WILL, Senior District Judge.*
 TONE, Circuit Judge.
 
 
 1
 This action by an employer against a local union under § 303 of the Labor Management Relations Act raises the question of whether a strike was protected by the work preservation doctrine established in National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The district court, after trial, held that it was. We disagree and reverse the judgment.
 
 
 2
 This is the second time the case has been before us. In an earlier, unpublished decision we reversed a summary judgment on the issue of liability in favor of the employer, and remanded for trial.[1] After trial on remand, the district court entered a judgment for the union.[2] The present appeal is from that judgment.
 
 
 3
 In 1970 plaintiff-appellant, George E. Hoffman & Sons, Inc., executed a contract with the State of Illinois to widen and resurface sections of two highways near Princeville, Illinois.[3] The work was to be done during the summer of 1971.
 
 
 4
 Hoffman arranged to subcontract part of the material hauling to three trucking firms, two of which were Long Rock Company and C. A. Walker Truck Lines, Inc.[4] Hoffman was to construct a portable asphalt production plant on Long Rock's property in Peoria, about two miles from the project site. The subcontractors were to transport stone, fly ash, and blow sand from various places to the asphalt plant. Long Rock and Walker Truck Lines were also to transport asphalt from the plant to the project site.
 
 
 5
 The drivers for Hoffman and the subcontractors were members of two locals of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Hoffman's drivers were all members of Local 627, the defendant in this case. Some Long Rock and Walker Truck Lines drivers were members of Local 627. Others were members of Local 15, which is not a party here.
 
 
 6
 Hoffman and the local unions were parties to a collective bargaining agreement, called the "Articles of Construction Agreement," which covered the period April 1, 1970 to April 1, 1973. The agreement had been negotiated between the Illinois Conference of Teamsters, representing Locals 627 and 15 as well as twelve other Teamsters locals in the state, and the Associated General Contractors of Illinois on behalf of its members, one of whom was Hoffman. Long Rock and Walker Truck Lines were not members of the Associated General Contractors. They separately and independently adopted the agreement after it had been negotiated and entered into by that association and the Conference of Teamsters.
 
 
 7
 The agreement contains a number of provisions pertinent to this case. Each Teamsters local was conceded to have exclusive jurisdiction over certain counties in Illinois.[5] Contractors were required to give notice of impending work to the local union with jurisdiction over the work area and to "request the Referral Office serving the area" to refer persons "available for employment." Generally, the referral office was to refer drivers "from the top" of the referral list, but the prospective employer could ask that specific individuals be referred first. A "pre-job conference between the contractor and the Business Representative of the Local Union in whose territory the work is to be performed" was to be held for the purpose of resolving questions concerning the application of the agreement. As to subcontracting,
 
 
 8
 The Contractor may hire or contract for the use of operated trucks be they from a fleet owner, another contractor or an owner driver, provided they do not replace his regular employees where he has the necessary equipment available.[6]
 
 
 9
 In February 1971 Robert Barker, president and business representative of Local 627, met with two Hoffman representatives in preparation for the upcoming paving season. In accordance with industry practice, Hoffman had terminated the employment of all its drivers at the end of the previous paving season and had yet to rehire any drivers. At the meeting Hoffman requested that the fourteen Local 627 members who had driven for it the previous year be referred first. The parties call the list of those men the "seniority list." Barker agreed to this request, and the union referred those men first during the 1971 season.
 
 
 10
 The previous season Hoffman had owned ten tandem trucks that had been operated by the men on the seniority list. Between mid-February and early March of 1971, Hoffman sold five of the trucks.
 
 
 11
 A "pre-job conference" for the Princeville work was held on March 3, 1971. At that time Barker approved Hoffman's subcontract with Long Rock although he knew that all except one of Long Rock's drivers were members of Local 15 rather than 627. According to Barker, Hoffman's general superintendent "agreed in the meeting that (Hoffman) employees would be working first." Shortly after the pre-job conference Barker met with a Walker Truck Lines representative and approved the company to do the work under the subcontract on condition that Walker "use (its) Local 627 drivers first and fill in with (its) Local 15 drivers . . . ." Barker then telephoned Hoffman and approved the subcontract with Walker Truck Lines.
 
 
 12
 The dispute that gave rise to this case began when, two weeks later, Barker learned that Hoffman had sold five of its ten tandem trucks. Believing that he had been "double crossed," Barker promptly complained orally to J. T. Hackler, Hoffman's general superintendent, and confirmed his complaint with the following telegram to Hoffman:
 
 
 13
 I am now informing your company that you are not to use any drivers that are not members of Local 627 to do work in the jurisdiction of Local 627. Any drivers that are members of Local 627 must by (sic) cleared by myself. This is in accordance with the agreement between your company and Teamsters Local 627.
 
 
 14
 As Barker knew, Hoffman itself did not employ, within the jurisdiction of Local 627, any drivers who were not members of that local. Barker testified that he made the clearance demand so he could ensure that seniority list members would work before any other Local 627 members were hired.
 
 
 15
 Barker reasserted his complaint in mid-May, after Long Rock and Walker Truck Lines began hauling asphalt from the plant to the project site. He testified that in a telephone conversation with Hackler the following was said:
 
 
 16
 I told him that I was up on the job site, that he had Walker and Long Rock trucks hauling on the site with Local 15 drivers and asked him if he had received a copy of the telegram that I had mailed him previously. He said yes . . . . I said do you have any intent of complying with my telegram, and he said no, he did not, and I told him that I was going to file a claim for backpay for the Hoffman drivers and people off of our referral list for all hours worked by the Local 15 people on this project.
 
 
 17
 Hackler "more or less" said that the matter "was out of his (Hackler's) hands, that he couldn't control it."
 
 
 18
 Barker's words, "the Hoffman drivers," apparently referred to the fourteen drivers who had been employed by Hoffman the previous season, i. e., those on the seniority list. The status of those fourteen men as of May 4, 1971, before either subcontractor used Local 15 drivers wholly within Local 627's jurisdiction, was as follows: Ten had already been rehired by Hoffman. Two others were working regularly elsewhere. The remaining two were unemployed, but one had not been hired by Hoffman the preceding year until October 22.
 
 
 19
 Barker's phrase, "people off of our referral list," on its face, included any additional drivers Hoffman would have had to hire in order to perform itself all the hauling done by the subcontractors' Local 15 drivers. That this was Barker's meaning is confirmed by a grievance he filed against Hoffman a few days later pursuant to the arbitration provisions of the Articles of Construction Agreement. There he stated that "George Hoffman & Sons has trucks working in the Local 627 jurisdiction that do not belong to Local 627," and demanded "that Local 627 people be compensated for all hours worked by these outside drivers." (Emphasis supplied.) The "outside drivers" were, of course, the members of Local 15 employed by Long Rock and Walker Truck Lines. On June 10, 1971, the grievance committee, by a vote of five to one, "upheld" Barker's claim "from March 18, 1971, the date the Local Union sent the telegram." The dissenting member of the committee expressed the view that the grievance should have been filed against Long Rock and Walker Truck Lines, not Hoffman.
 
 
 20
 The evolution of the dispute into a strike was not long in coming. When Barker asked Hoffman for access to the payroll records of Long Rock and Walker Truck Lines, Hoffman responded that it did not have those records and did not intend to comply with the grievance committee award. On June 15, 1971, Local 627 called a strike against Hoffman. Pickets were placed at Hoffman's office in Peoria, at the construction site, and at the asphalt plant. Work was stopped on the Princeville project and all other Hoffman projects in Local 627's jurisdiction. Barker testified that the pickets were set up because of Hoffman's "failure to abide by the decision of the Joint Grievance Committee."
 
 
 21
 On July 1, 1971, the Associated General Contractors of Illinois filed unfair labor practice charges against Local 627, alleging violation of §§ 8(b)(4)(A), 8(b)(4)(B), and 8(b)(4)(D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(A), (B), & (D). After the issuance of a complaint, the parties executed an informal settlement with respect to the alleged § 8(b)(4)(A) and § 8(b)(4)(B) violations, and the Board dismissed the § 8(b)(4)(D) charge for lack of jurisdiction.[7] Hoffman did not appeal from that decision.[8]
 
 
 22
 At about the time that Hoffman commenced the unfair labor practice proceedings, it also filed the instant action for damages under § 303 of the Labor Management Relations Act, 29 U.S.C. § 187. In its complaint it alleged that Local 627's strike and picketing violated § 8(b)(4)(A), (B), and (D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(A), (B), & (D).
 
 
 23
 Shortly thereafter Barker wrote to Hoffman, stating that
 
 
 24
 The litigation you have recently commenced against this Local Union indicates a serious misunderstanding on your part as to the nature of our dispute with your company.
 
 
 25
 Our grievance was filed against your company only because Hoffman officials, . . . , have assumed responsibility for dealing with this Local Union with respect to the employment of our truck drivers connected with the job.[9]
 
 
 26
 Richard Curren, Assistant to Hoffman's executive director, replied that "Hoffman has, and has had no control over the labor practices of (its subcontractors)."[10] There is no evidence, and Local 627 does not now contend, that Hoffman had any control over the subcontractors' hiring or ever assumed responsibility therefor in its dealings with Local 627.
 
 
 27
 Shortly after these letters were exchanged, Local 627 ended its strike against Hoffman, some sixty-one days after it began. The strike caused Hoffman to lose thirty-four work days. When work on the paving project resumed, Walker Truck Lines used only Local 627 drivers for hauling fly ash and blow sand to the asphalt plant and asphalt to the project site. Long Rock continued to use Local 15 drivers to haul blow sand from Local 15's jurisdiction to the asphalt plant, but ceased hauling asphalt from the plant to the project site because it refused to request referral of Local 627 drivers.[11] Hoffman executed a subcontract with another company to assist Walker Truck Lines in hauling the asphalt, apparently one willing to use only Local 627 men.
 
 
 28
 The present action proceeded after the settlement of the strike, and reaches us for final disposition after a lengthy series of proceedings. Initially, the district court granted summary judgment in favor of Hoffman on the issue of liability. Later the court conducted a bench trial on the issues of damages, and entered a final judgment in favor of Hoffman for $117,512.57. See note 1 supra. In reversing that judgment by an unpublished decision, this court summarized the controlling issue as follows:
 
 
 29
 Hoffman's claim for damages is dependent on the validity of its contention that the local's purpose in calling the strike was to force the company to cease doing business with subcontractors who did not use Local 627 drivers. A strike so motivated directed at the prime contractor in order to exert pressure on it to stop dealing with its subcontractors would constitute an illegal secondary boycott and entitled Hoffman to the recovery of damages, including lost profits, under section 303 of the LMRA. The critical issue is, therefore, the determination of Local 627's motivation in calling the strike. If the object of the local's activities was to force Hoffman to reform its contracts with its subcontractors so that work on the Princeville project would be reassigned to Local 627 drivers, the strike would not constitute protected activity under section 8(b)(4). If, however, as the local asserts, the strike was directed at Hoffman in an effort by the union to preserve for its members those jobs they had traditionally performed, its actions had the characteristics of primary activity and are thus protected from a suit for damages under section 303, which applies only when an employer is injured due to a violation of section 8(b)(4)'s prohibition against secondary activity.
 
 
 30
 (Footnote omitted.) The court held that "the object of the strike was not a matter which was capable (of) determination at the summary judgment stage."
 
 
 31
 After a bench trial on remand before a different judge of the district court, judgment was entered in favor of Local 627. The court found that "the objective of (Barker's) actions following his discovery of the truck sales was to preserve the jobs of Hoffman, Inc. drivers displaced by the apparent breach of the pre-job agreement." George E. Hoffman & Sons, Inc. v. Teamsters Local 627, supra note 2, 99 L.R.R.M. at 3238. Although noting that it was "necessary to assure that . . . the defendant's reactions did not become overbroad so as to encompass other, impermissible objectives," id., the court did not state in its findings that the union's sole object was work preservation. Instead, the court said:
 
 
 32
 All of the facts and circumstances lead me to believe that the strike was motivated by a desire to assert pressure on Hoffman, Inc. to compel conformity to the pre-job arrangement as understood by the Local and enforcing the arbitration decision of the Joint Committee.
 
 
 33
 Id.
 
 I.
 
 34
 The controlling legal principles are well settled. Only "secondary" conduct is proscribed by §§ 8(b)(4)(A) and 8(b)(4)(B). Those provisions are aimed at "shielding unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951) (quoted in National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 626-27, 87 S.Ct. 1250, 1258-59, 18 L.Ed.2d 357 (1967)). See also Kable Printing Co. v. NLRB, 545 F.2d 1079 (7th Cir. 1976). A court must decide whether "under all the surrounding circumstances" a strike is directed at "the labor relations of the contracting employer vis-a-vis his own employees" or is "tactically calculated to satisfy union objectives elsewhere." National Woodwork Manufacturers Association v. NLRB, 386 U.S. at 644-45, 87 S.Ct. at 1268; see NLRB v. Enterprise Association of Pipefitters Local 638, 429 U.S. 507, 528, 97 S.Ct. 891, 903, 51 L.Ed.2d 1 (1977).[12]
 
 
 35
 To be lawful a strike must be for objectives wholly "primarily." Any "secondary" objective will bring the union's action within the reach of § 8(b)(4). NLRB v. Enterprise Association of Pipefitters Local 638, 429 U.S. at 530 n.17, 97 S.Ct. at 904 n.17;[13] NLRB v. Denver Building & Construction Trades Council, 341 U.S. at 689 & n.18, 71 S.Ct. at 952 & n.18.
 
 
 36
 The district court in this case did not address specifically the question of whether the strike's objectives were wholly primary or in part secondary. The court did, as we have noted, find that the objective was work preservation and hold that consequently the strike was lawful. We must assume that the court was aware of the legal principles just summarized and, accordingly, that the court intended to find that the objective was wholly primary.
 
 II.
 A.
 
 37
 Local 627's first contention is that the sole objective of the strike was to preserve the jobs its members would have had if Hoffman had not sold the five trucks.[14] Hoffman has conceded that if the strike was thus limited, it was permissible as work preservation. Assuming that the district court intended to make such a finding, however, that finding is clearly erroneous.[15]
 
 
 38
 The record clearly establishes that Barker's demands, although apparently triggered by the sale of the five trucks, were not merely for the jobs lost to Local 627 members by reason of that sale. The demands were that no Local 15 drivers be permitted to drive.
 
 
 39
 Barker's oral and written statements described above, including his written grievance, demand that all drivers working on the project wholly within Local 627's jurisdiction be Local 627 members. He made no reference in those statements to the jobs the five additional trucks would have made available. Instead, he specifically objected to the presence of any Local 15 drivers on the job site and made the unqualified demand that none be employed there.
 
 
 40
 In addition, no underlying correlation exists between these demands and the jobs attributable to the five trucks. Barker did not assert, nor does the union now assert, that prohibiting use of any Local 15 drivers by subcontractors was equivalent in effect to regaining the jobs the five sold trucks would have provided Local 627 drivers. The hauling on the project could easily have exceeded, and in fact did exceed even prior to the strike,[16] the combined capacities of the ten trucks Hoffman would have owned if none have been sold and the subcontractors' trucks driven by Local 627 members.[17] Consequently, subcontractors' trucks driven by Local 15 members would have been needed to work on the project even if Hoffman had not sold the five trucks.[18] No showing was made that Barker expected otherwise at any time before the strike. Thus the record could not support a finding that the union was concerned only with providing its members with jobs that would have resulted from Hoffman's retention of those five trucks.
 
 B.
 
 41
 Local 627's alternative position is that even if its objective was not limited to requiring that its members do the work Hoffman would have done if the trucks had not been sold, but extended to coercing Hoffman into refusing to deal with subcontractors who did not employ exclusively Local 627 drivers on the Princeville project, its action was nonetheless primary.[19] It is argued that Hoffman, Long Rock, and Walker Truck Lines were parties to the Articles of Construction Agreement, and that therefore Local 627's "efforts to preserve, protect or recapture the traditional work of Local 627 drivers" anywhere within its territorial jurisdiction, as defined in the agreement, should be regarded as primary.[20]
 
 
 42
 To be justified by the work preservation doctrine, a strike objective must be directed against an employer who is not disinterested with respect to that objective. In adopting the secondary boycott provisions, "Congress was not concerned to protect primary employers against pressures by disinterested unions, but rather to protect disinterested employers against direct pressures by any union."[21] Houston Insulation Contractors Association v. NLRB, 386 U.S. 664, 668, 87 S.Ct. 1278, 1281, 18 L.Ed.2d 389 (1967) (quoting United Association of Journeymen Local 106, 110 N.L.R.B. 206, 209 (1954)).[22] If Hoffman, the target of Local 627's strike, was disinterested with respect to an object of the strike, it was entitled to the protection of the statute.
 
 
 43
 The union's argument that Hoffman was not disinterested is based on the fact that the two subcontractors had signed collective bargaining agreements identical to the Articles of Construction Agreement, which Hoffman had signed. This, however, did not make Hoffman an interested party to Local 627's dispute with the subcontractors. Hoffman and the subcontractors were independent, unaffiliated companies. Neither of the subcontractors was a member of the Associated General Contractors, which had negotiated the Articles on Hoffman's behalf, and neither was shown by the evidence to have been represented by that association in negotiating the Articles or for any other purpose.[23] The Articles contain a specific disclaimer of joint liability.[24] Absent action as a group by employers who have signed the same contract, an employer signatory is not responsible for individual decisions of its co-signatories or subject to economic retaliation for their individual actions. Griffith Co. v. NLRB, 545 F.2d 1194, 1195-96 & 1200-01 (9th Cir. 1976), cert. denied, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 125 (1977).[25] Local 627 has cited no authority to the contrary,[26] and our research has revealed none.[27]
 
 
 44
 Thus Local 627's strike was in part secondary. The dispute over the part of the work that Hoffman was never equipped to do itself and that no one ever contemplated Hoffman would do itself was between Local 627 and the subcontractors. As to that dispute and that work, Hoffman was a disinterested employer in the same position as the employer granted protection in NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 304-05, 91 S.Ct. 402, 407, 27 L.Ed.2d 398 (1971). See also, e. g., Local 644, United Brotherhood of Carpenters v. NLRB, 175 U.S.App.D.C. 1, 533 F.2d 1136 (D.C.Cir.1975).
 
 
 45
 The union's illegal demands cannot be saved by reliance on the pre-job agreement or the arbitration award. Coercing Hoffman to construe the pre-job agreement as requiring termination of the subcontractors unless they agreed to use only Local 627 members on the job was illegal under § 8(b)(4)(A) or § 8(b) (4)(B).[28] Similarly, that the objective was stated in terms of enforcing a grievance award purporting to require compliance with such an agreement does not save the strike.[29]
 
 III.
 
 46
 Hoffman also argues that Local 627's strike was within § 8(b)(4)(D) of the Act, 29 U.S.C. § 158(b)(4)(D), which provides generally that it is an unfair labor practice to engage in or encourage a strike where "an object" thereof is to force or require an employer to assign work to a particular labor organization. This provision, like § 8(b)(4)(A) and § 8(b)(4)(B), is intended to discourage labor organizations from drawing employers into controversies not their own. Union efforts to force an employer to pressure another employer into assigning work to one labor organization rather than another violate both § 8(b)(4)(B) and § 8(b)(4)(D). See NLRB v. Local 825, International Union of Operating Engineers, supra, 400 U.S. at 305-06, 91 S.Ct. at 407-08; Teamsters Local 216 v. NLRB, 171 U.S.App.D.C. 440, 448, 520 F.2d 172, 180 (D.C.Cir.1975).
 
 
 47
 As noted above, the Associated General Contractors filed charges with the NLRB on Hoffman's behalf, asserting that Local 627's strike against Hoffman was an unfair labor practice as defined in § 8(b)(4)(D) and other provisions of the Act.[30] Although dismissing the § 8(b)(4)(D) charge on jurisdictional grounds, the Board found that there was a jurisdictional dispute between Local 627 and Local 15.[31] The disputed work was said to be the following:
 
 
 48
 All truck driving duties related to the project of widening and resurfacing the fifteen mile stretch of Illinois Routes 90 and 91 near Princeville, Illinois, performed by Long Rock Stone Company or by C. A. Walker Truck Lines, Inc.
 
 
 49
 Teamsters Local 627, supra note 7, 195 N.L.R.B. at 93 n.1. According to the district court, however, § 8(b)(4)(D) was not violated because "(a) reasonable view of the facts in this case is that Local 627 was picketing to prevent their employer from continuing to assign to Local 15 work which had originally been assigned to Local 627." 99 L.R.R.M. at 3238.
 
 
 50
 Such a view of the facts was clearly erroneous, in light of the evidence summarized above and the NLRB's contrary finding. A violation of § 8(b)(4)(D) was therefore established.
 
 IV.
 
 51
 Although there is no judgment for damages before us, the posture of the case makes it necessary to determine the issue of damages. In a separate trial on that issue held before the first appeal, the district court awarded Hoffman $117,512.57. George E. Hoffman & Sons, Inc. v. Teamsters Local 627, 384 F.Supp. 1252 (S.D.Ill.1974). Hoffman argues that if we hold the union liable we should declare that award inadequate. Inasmuch as neither Hoffman nor the union sought a new trial on damages in their briefs or oral arguments in this court,[32] we decide the damages issue on the record before us.
 
 
 52
 The damages allowed were in four categories: certain expenses incurred because of the strike; lost profits on sales of materials; lost profits that would have been earned if the strike had not prevented Hoffman from performing contracts it had entered into; and lost profits on an amount of work not bid that Hoffman would have done absent the strike.
 
 
 53
 The court disallowed damages allegedly caused by delays on certain projects, because the evidence that the delays were caused by the strike was insufficient. Also, the court refused to allow most of the damages Hoffman claimed for lost profits on contracts on which it did not bid because of the strike. The reason was that,
 
 
 54
 even in a prime work period of a prime season with much work available, it cannot fairly be assumed that a volume of work which was not bid would have been both bid and received in such order as to keep the workload and facilities in reasonable balance for the whole season.
 
 
 55
 384 F.Supp. at 1254.
 
 
 56
 Hoffman argues that all the damages it claimed should have been allowed. It cites authorities to the effect that uncertainty as to the precise amount of damages should be resolved against the wrongdoer, e. g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-66, 66 S.Ct. 574, 579-80, 90 L.Ed. 652 (1946), and that "a just and reasonable approximation" is all that is required, e. g., Sheet Metal Workers Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101, 109 (5th Cir. 1967). We do not question these general propositions, nor did the district court. Nevertheless, the fact of damages, as distinguished from the amount, must be proved. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). And the party complaining of error in findings of the trial court must demonstrate the error with something more than general assertions of the kind made here. A reviewing court will not make its own search of the record to determine whether such general assertions are supportable.
 
 
 57
 Hoffman has not persuaded us that the district court erred in finding a failure of proof that the strike caused the delays complained of. Nor do we find error in the court's disallowance of a substantial part of the damages claimed for work not bid.
 
 
 58
 The court did allow $41,860 of lost profits on unbid work, based on a finding that if the strike had not occurred Hoffman would have been able to do at least $200,000 of additional work that it did not bid. The union attacks this portion of the award as inconsistent with the district court's disallowance of the damages for all the unbid work Hoffman contended it could have done absent the strike. There is no inconsistency. That the court could not find on the evidence that Hoffman would have worked at the same capacity all season as it did before and after the strike does not preclude a finding that at least some of the unused capacity would have been used.
 
 
 59
 The finding that $200,000 of unbid work would have been done absent the strike is not clearly erroneous. Hoffman offered evidence of the large volume of work available, exceptionally good weather, and its average daily gross receipts for days it actually worked in the summer of 1971. Multiplying that figure by the number of work days lost because of the strike yielded approximately $1,600,000 in total work lost because of the strike. Reducing this figure by approximately $200,000 of lost work on contracts actually received by Hoffman leaves $1,400,000 attributed to work not bid because of the strike. The district court did not allow lost profits on that amount, as we have noted. It could not find on the evidence that any particular contract on which Hoffman might have bid would have been awarded, or that it would have been possible to coordinate all the jobs so that Hoffman could have worked at the same level during the strike period as it did before and after. Nevertheless, Hoffman's evidence was sufficient to support the court's finding that at least $200,000 of the unbid work would have been done in the absence of the strike. When the fact of damage is shown, the plaintiff's inability to prove damages with absolute precision does not preclude an award. Accordingly, we affirm the district court's award of $117,512.57 in damages, which includes the disputed $41,860 on unbid work.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The district court's decision is reported as George E. Hoffman & Sons, Inc. v. Teamsters Joint Council 65, 352 F.Supp. 677 (S.D.Ill.1973). Later the court tried and decided the issue of damages, George E. Hoffman & Sons, Inc. v. Teamsters Local 627, 384 F.Supp. 1252 (S.D.Ill.1974). That issue was also before us on the prior appeal, but we did not reach it. Our decision is noted at 530 F.2d 979 (1976)
 
 
 [2]
 George E. Hoffman & Sons, Inc. v. Teamsters Local 627, 99 L.R.R.M. 3236 (S.D.Ill.1978)
 
 
 [3]
 To the extent that the evidence is conflicting, we rely primarily on the testimony of Robert Barker, president and business representative of appellee Teamsters Local 627, since that is the only evidence referred to by the union to support the district court's decision
 
 
 [4]
 The ensuing difficulties, which we detail in text infra, did not involve the third subcontractor, Winzeler Trucking, Inc., because it employed only drivers from defendant Teamsters Local 627 on the Princeville project
 
 
 [5]
 The project site and the asphalt plant were within Local 627's jurisdiction. Except for the sand hauled by Long Rock, all of the material transported to the asphalt plant under the three subcontracts also came from sources within Local 627's jurisdiction
 
 
 [6]
 "Regular employees" is not defined in the collective bargaining agreement
 
 
 [7]
 Teamsters Local 627, 195 N.L.R.B. 93, 94 (1972)
 
 
 [8]
 Although the Board ultimately concluded that the § 10(k) proceeding should be dismissed, it rejected the contention of Locals 627 and 15 that, because Local 15's secretary-treasurer disclaimed the work, there was no jurisdictional dispute. Teamsters Local 627, supra note 7, 195 N.L.R.B. at 94 & n.4
 
 
 [9]
 Barker's letter in full is as follows:
 The litigation you have recently commenced against this Local Union indicates a serious misunderstanding on your part as to the nature of our dispute with your company.
 First, members of Local 627 have been and are on strike to enforce a final and binding decision of the Joint Grievance Committee against your company involving backpay for time worked by outside drivers, and for no other reason. Secondly, as you surely have realized, outside drivers mean truck drivers who have not been referred for employment or cleared by this Local Union's referral office. The Committee's decision, like the grievance on which it was based, is premised upon the duty of each contractor signatory to the current Articles of Construction Agreement to employ drivers from "the referral office serving the area in which the job is located", namely Local 627's Peoria referral office in this situation. Here, the drivers eligible for backpay happen to be members of our Local Union (although the contract does not require that they be so). Therefore, there is nothing in our grievance or in the decision that sustains it that compels your company to cease contracting with Long Rock Co., Inc. or C. A. Walker Trucking for hauling work involved in your Peoria county highway project. Each of these firms, as well as Winzeler Trucking, is signed to the Articles of Construction Agreement with this Local Union and otherwise qualifies as a subcontractor to your company for trucking work covered by our Agreement.
 Our grievance was filed against your company only because Hoffman officials, from the very inception of our dealings on this project, have assumed responsibility for dealing with this Local Union with respect to the employment of our truck drivers connected with the job. In fact, Long Rock Co., Inc., C. A. Walker Trucking, and Winzeler Trucking representatives did not even attend our pre-job conference or hold one of their own. Subsequently, at least one of these contractors informed us that your company had taken full charge of fulfilling his obligations to this Local Union on that job. You can surely understand, therefore, why we have, until now, looked to Hoffman for redress for all contract violations involving hauling work on your job.
 If the situation changes or has changed in this regard, please advise the undersigned promptly. Thereafter, we will of course, no longer seek to hold Hoffman liable for contract violations by other contractors to whom it has properly let work. Rather, we will hold each signatory contractor responsible for its own violations in these circumstances.
 We trust this clears up any confusion or misunderstanding that your company may have previously had with respect to the position of this Local Union.
 
 
 [10]
 Curren's letter in full, dated August 3, 1971, is as follows:
 Your letter to Geo. E. Hoffman & Sons, Inc., dated July 28, 1971, has been referred to me for reply, and to set the record straight:
 (1) With regard to your letter's interpretation of the grievance award which you state you are striking to enforce, and your self-serving statement as to the premise on which it was based, both statements are inconsistent with and contradictory to your telegram on March 18, 1971, your written grievance, your statements to the Grievance Committee, and to the Hoffman Company after the award. Moreover it is quite apparent that your demands do amount to a requirement to cease doing business with the named subcontractors, within the meaning of the LMRA.
 (2) With respect to your statements concerning the relationship between Hoffman and Long Rock, Walker, and Winzeler, please be advised that Hoffman has, and has had no control over the labor relations policies and practices of those companies. This is not a change. You have already been advised that grievances involving the union membership of those companies' employees should have been directed to those companies, and you have dealt directly with those companies regarding such matters relative to the Princeville job.
 
 
 [11]
 Teamsters Local 627, supra note 7, 195 N.L.R.B. at 94
 
 
 [12]
 For further elaboration of this test, see National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 630-31, 645, 87 S.Ct. 1250, 1260-61, 1268, 18 L.Ed.2d 357 (1967); Plumbers Local 342 v. NLRB, 194 U.S.App.D.C. 297, 301, 598 F.2d 216, 220 (D.C.Cir.1979); Griffith Co. v. NLRB, 545 F.2d 1194, 1200 & n.10 (9th Cir. 1976), cert. denied, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 125 (1977)
 
 
 [13]
 In Enterprise Association, the Court said, quoting in part from NLRB v. Denver Bldg. & Constr. Trades Council, supra, 341 U.S. at 689, 71 S.Ct. at 952:
 "It is not necessary to find that the sole object of the strike" was secondary so long as one of the union's objectives was to influence another employer by inducing the struck employer to cease doing business with that other employer.
 429 U.S. at 530 n.17, 97 S.Ct. at 904 n.17. See also NLRB v. Milk Wagon Drivers' Local 753, 335 F.2d 326, 329 (7th Cir. 1964).
 
 
 [14]
 The union argues that our decision on the prior appeal established as the law of the case that "if Barker did not know of the truck sales until after the pre-job conference and agreement and his objective was work preservation then no liability exists." It may be conceded that, regardless of whether Barker knew of the five truck sales, the union would not be liable if his object was solely work preservation. On the prior appeal, his knowledge of the truck sales was thought to relate to that issue. On review was a summary judgment that appeared to have been based on the reasoning that because Barker knew at the time of the pre-job agreement that Hoffman was going to sell at least one truck and because the pre-job agreement required that Hoffman trucks, not Hoffman drivers, work first, the strike demands impermissibly went beyond the scope of the pre-job agreement and focused on the subcontractors. This court, finding that these two subsidiary factual conclusions were disputed by the local and thus that summary judgment was not proper, reversed and remanded, saying,
 If in fact Barker had no notice of the sales of the trucks until after the agreement was reached, it is likely that this fact coupled with the wording of the agreement and the rationale of Local 627's "work preservation" defense would support a finding that the strike was motivated by a desire to assert pressure on Hoffman & Sons and had as its object compelling conformity to the pre-job arrangement as understood by the local.
 The assumption underlying this statement was that the sole object of the strike was to enforce the pre-job agreement by compelling Hoffman to employ the Local 627 drivers that would have driven the five trucks. However, since the remand was for trial on all questions of fact, Hoffman was free to advance the theory that the foregoing assumption was incorrect and that even if both fact findings of the original trial court were erroneous, the strike was still impermissible because the union's objectives extended beyond the jobs that went with the five trucks. The evidence showed this was so, as we explain in the text, infra. Nothing in our prior decision indicates that Local 627 would not be liable if the objective of the strike was not solely work preservation but in part displacement of subcontractors' drivers who were doing work that Hoffman was never in a position to do.
 
 
 [15]
 As we have already noted, the district court, while it made the general finding that the objective of the strike was work preservation, did not make concrete findings concerning the objective of the strike
 The union also argues that the record supports a more limited conclusion: that the strike was to preserve jobs lost because of the sale only for its members on Hoffman's seniority list. The evidence we cite in text to show that the union's broader contention is not supported by the evidence, of course, disposes of this argument as well.
 
 
 [16]
 Exhibits in evidence show that on at least four of the twenty-three days that the two subcontractors worked on operations wholly within Local 627's jurisdiction they would have needed to use trucks driven by Local 15 members even if Hoffman had had ten trucks. We assume in so stating that Barker's objections did not extend to Long Rock's use of Local 15 drivers in the hauling of blow sand from Local 15's jurisdiction to the asphalt production plant. The record supports this assumption, as do the fact findings of the National Labor Relations Board in the separate unfair labor practice proceeding, Teamsters Local 627, supra note 7, 195 N.L.R.B. at 94
 
 
 [17]
 Both Long Rock and Walker Truck Lines had Local 627 members as well as Local 15 members working on the Princeville project. As noted above, the latter promised Barker that its Local 627 members would work first on the project. We are assuming that that actually occurred and that the same was true for Long Rock
 
 
 [18]
 The union correctly points out that the existence of foreseeable secondary consequences does not always mean that an object of a strike is to change the hiring practices of the secondary employer. NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 304-05, 91 S.Ct. 402, 407, 27 L.Ed.2d 398 (1971); National Woodwork Mfrs. Ass'n v. NLRB, supra note 12, 386 U.S. at 627, 87 S.Ct. at 1259; Local 644, United Bhd. of Carpenters v. NLRB, 175 U.S.App.D.C. 1, 14-15 n.35, 533 F.2d 1136, 1149-50 n.35 (D.C.Cir.1975). The presence here of significant effects on the subcontractors, together with the scope of the union's demands, requires the conclusion that the strike was partly directed to the hiring practices of the subcontractors
 
 
 [19]
 As stated earlier, despite Barker's assertion in his July 28 letter that Hoffman had assumed responsibility for subcontractors' dealings with Local 627 for the project, the union does not now argue that this was so or that Hoffman should be held responsible for the hiring practices of Long Rock and Walker Truck Lines on this basis. Both appear from the record to have been independent companies whose driver assignments were not subject to Hoffman's control
 
 
 [20]
 The union also argues, although not in detail, that all the material hauling work was "fairly claimable" from Hoffman and thus a permissible primary object of union efforts. See Meat & Highway Drivers Local 710 v. NLRB, 118 U.S.App.D.C. 287, 292, 335 F.2d 709, 714 (D.C.Cir.1964). Traditionally, union members had done material hauling for Hoffman within the local's territorial jurisdiction. Such hauling was thus "a type (of work) which the men in the bargaining unit have the skills and experience to do." Id. According to the union, because material hauling was not a type of work differing from what union members had done, the local could permissibly lay claim to all such hauling on Hoffman's jobs within its jurisdiction
 Even if we accept the local's argument, there is still the question of whether a union's actions may be secondary because of the quantity of the work claimed from the primary employer. We need not consider that issue here, however, since the record shows that the local was attempting not to persuade Hoffman to do all its material hauling but to have the subcontractors use Local 627 members on the project within the local's jurisdiction. Nowhere is there any indication that Barker asked Hoffman to buy or rent additional trucks sufficient for all the hauling work. Instead, his concern was with the subcontractors' use of Local 15 drivers on their own trucks.
 
 
 [21]
 Similar reasoning underlies the "ally doctrine," see, e. g., Kable Printing Co. v. NLRB, supra, 545 F.2d at 1084-85
 
 
 [22]
 Houston Insulation, a companion case to National Woodwork, held primary a strike by employees of one bargaining unit to preserve work for union members in a separate bargaining unit with the same employer
 
 
 [23]
 Local 627 seems to dispute this conclusion on the basis of the preamble to the Articles of Construction Agreement. The point was only raised in oral argument, so we do not know what particular provision of the preamble the union relies on. The only passage that provides any support at all for the assertion is found in paragraph three:
 the parties desire and intend this to be a multi-employer, multi-union negotiated agreement established for the classes of employees involved who work in the same area of identical wages, hours and working conditions, regardless of the contractor for whom they work or the Local Union which represents them.
 The context in which this passage is found makes it plain that it is only relevant to members of the Associated General Contractors. For example, paragraph four immediately succeeding the passage quoted above is as follows:
 As a means of accomplishing the objectives and purposes stated in Paragraph 3 above, the Association has been authorized to negotiate the terms and provisions of this Agreement for and on behalf of its members and the Conference has likewise been authorized to so negotiate for and on behalf of the Local Unions.
 
 
 [24]
 The Articles provide,
 It is further agreed that the liability of the Employers who accept, adopt or sign this Agreement, or a facsimile thereof, shall be several and not joint . . ..
 
 
 [25]
 Individual adoption of a contract negotiated by a multi-employer bargaining unit does not, without more, make the individual signatory a member of the multi-employer unit. See Moveable Partitions, Inc., 175 N.L.R.B. 915, 916 (1969); Raymond O. Lewis, 148 N.L.R.B. 249, 253-55 (1964). If Long Rock and Walker Truck Lines had been part of the multi-employer bargaining unit, at least some support would have existed for Local 627's actions. See, e. g., Local 644, United Bhd. of Carpenters v. NLRB, supra note 18, 175 U.S.App.D.C. at 22-23, 533 F.2d at 1157-58 (Leventhal, J., dissenting); Local 98, Sheet Metal Workers' Int'l Ass'n v. NLRB, 140 U.S.App.D.C. 83, 93-95, 433 F.2d 1189, 1199-1201 (D.C.Cir.1970) (Skelly Wright, J., dissenting)
 
 
 [26]
 American Boiler Mfrs. Ass'n v. NLRB, 404 F.2d 547 (8th Cir. 1968), cert. denied, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970), the only case cited in support of this argument, is inapposite. That case did not involve any attempt to enforce a work preservation agreement against one employer signatory by striking another. Nothing in the court's decision suggests that a strike against one employer to secure compliance with the agreement by another would be deemed "primary."
 
 
 [27]
 In International Union of Operating Engineers Local 12, 212 N.L.R.B. 343 (1974), rev'd sub nom. Griffith Co. v. NLRB, 545 F.2d 1194 (9th Cir. 1976), cert. denied, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 125 (1977), the Board did hold to be permissible union efforts to enforce a contract provision that effectively required general contractor association members to refrain from doing business with subcontractors that had signed the master labor contract individually and were "delinquent in their payments to the several fringe benefit trust funds jointly maintained and administered by the Union and the signatory Employers." 212 N.L.R.B. at 343. The Ninth Circuit reversed, however, reasoning in part that the agreement and its enforcement against the general contractor were aimed at the labor relations of the delinquent subcontractor. 545 F.2d at 1200-01
 
 
 [28]
 See Carrier Air Conditioning Co. v. NLRB, 547 F.2d 1178, 1185-86, 1188-90 (2d Cir. 1976), cert. denied, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); NLRB v. Milk Wagon Drivers' Local 753, supra note 13, 335 F.2d at 329
 
 
 [29]
 Indeed, seeking a grievance award for secondary objectives could have been an unfair labor practice under § 8(b)(4)(B), even if there had been no strike. See, e. g., Electro-Coal Transfer Corp. v. General Longshore Workers Locals 1418 & 1419, 591 F.2d 284, 289 (5th Cir. 1979); Carrier Air Conditioning Co. v. NLRB, supra note 28, 547 F.2d at 1191-93; Associated General Contractors, Inc. v. NLRB, 514 F.2d 433, 438-39 (9th Cir. 1975)
 At oral argument Local 627 asserted that the construction industry proviso to § 8(e) was applicable to the asphalt hauling. The district court made no findings of fact as to the nature of the work performed by the drivers who delivered the asphalt to the project site. Even if we assume that the hauling of hot asphalt requires some work to be done at the project site, the proviso does not appear to apply. See Drivers Local 695 v. NLRB, 124 U.S.App.D.C. 93, 98-99, 361 F.2d 547, 552-53 (D.C.Cir.1966) (delivery of ready-mix concrete to project site, where driver often mixes the concrete, is not work done at construction site for purposes of § 8(e) proviso); NLRB v. Teamsters Local 294, 342 F.2d 18, 21-22 (2d Cir. 1965) (same); Joint Council of Teamsters No. 42, 225 N.L.R.B. 208, 216-17 (1976) (same).
 
 
 [30]
 See text at note 7 supra
 
 
 [31]
 See note 8 and accompanying text supra
 The question was litigated, but its resolution was unnecessary for the Board's decision. Therefore, the finding is not preclusive. See generally Restatement (Second) of Judgments § 68, Comment h, § 68.1(a), Comment a (Tent. Draft No. 4, 1977); F. James & G. Hazard, Civil Procedure §§ 11.18-11.19 (2d ed. 1977). Before the district court, both parties disclaimed any reliance on the NLRB decision.
 
 
 [32]
 In its petition for rehearing, the union states that upon remand from this court's unpublished order in 1976 the district court denied the union's request for a new trial on damages. The union did not seek a review of this ruling on appeal, however